2022 IL App (1st) 200998-U

No. 1-20-0998

Order filed March 15, 2022.

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of |
| Plaintiff-Appellee, | ) ) | Cook County |
| v. | ) ) | 95 CR 33909 |
| SELMA BUTLER, | ) ) | The Honorable Mary M. Brosnahan, Joseph J. Urso, |
| Defendant-Appellant. | ) | Judges Presiding. |

_____

JUSTICE LAVIN delivered the judgment of the court.
Justices Howse and Cobbs concurred in the judgment.

**ORDER**

¶ 1    *Held*: While the trial court properly dismissed defendant's ineffective assistance of counsel claim and *Brady* claim, defendant was entitled to a third-stage evidentiary hearing on his claim of actual innocence.

¶ 2    This appeal arises from the trial court's second-stage dismissal of defendant Selma

Butler's petition filed under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.*

(West 2018)). After almost two decades of postconviction litigation, we reverse and remand for an evidentiary hearing.

¶ 3                                    I. Background

¶ 4                                 A. Trial Proceedings

¶ 5      On November 13, 1995, 34-year-old Angela Young was brutally murdered in her 13th-floor apartment at 4331 South Federal, a Chicago Housing Authority building (CHA building) that was controlled by the Gangster Disciples. Angela sustained 66 stab and incised wounds. Defendant, then 17 years old, and codefendant Gino Wilson, then 15 years old, were charged in the same indictment. Both elected bench trials before Judge Joseph J. Urso. After codefendant was acquitted, defendant was found guilty of first-degree murder.

¶ 6      Prior to trial, the assistant public defender (APD) filed a motion to suppress defendant's unmemorialized statements. The motion alleged that while defendant was riding in a police car, Detective Bernard Ryan reached over the front seat, grabbed him by the throat and repeatedly called him a liar. Detective Ryan denied the allegations. At a hearing, he testified that defendant first denied involvement in the murder but ultimately made an oral statement after admitting to a polygraph examiner that he had been lying. The detective never grabbed his throat or told him he needed to make a statement, as "[h]e already made a statement." Subsequently, defendant made a substantially similar oral statement in the presence of Assistant State's Attorney (ASA) Tom Darden. Following Detective Ryan's testimony, the APD obtained a continuance to procure the polygraph examiner's testimony but, for reasons unclear from the record, the APD never presented that testimony. The trial court denied defendant's motion.

¶ 7 At trial, Angela's daughter, Shamika Young, testified that in 1995, she lived with her mother in unit 1301 of the CHA building. She saw Angela on November 10, 1995, and spoke to her on the phone two days later. The next day, Shamika learned that her mother was dead.

¶ 8 Earl Gilmore, who was 14 years old at the time of the murder, testified that he knew defendant, known as Little Boo, as well as codefendant and Antonio Thomas, who was 16 years old. At the time of the murder, Gilmore was at his sister's house, not the CHA building. After being arrested in an unrelated case, he gave a statement regarding Angela's murder and testified before a grand jury. The police, however, had forced Gilmore to testify as he did before the grand jury under threat that he himself would be charged with the murder. Furthermore, a man who may have been an ASA told Gilmore to "just go along with everything they say. He told me to go along with everything that the Grand Jury asked me."

¶ 9 Before the grand jury, Gilmore testified that at 5:30 a.m. on the day in question, he saw defendant and codefendant on the first floor of the CHA building. When a man asked the pair for marijuana, they took the elevator the 13th floor to retrieve it. Gilmore and Thomas, who had taken the stairs to the same floor, saw defendant and codefendant exit the elevator and enter unit 1301, where the two men stored marijuana. Gilmore and Thomas then followed them inside and into a back bedroom, where a woman, apparently Angela, was lying on her back. Defendant punched her in the face and codefendant stabbed her all over her body. After Angela scratched codefendant's face, he gave the knife to defendant, who similarly stabbed her all over her back and in the head. When defendant and codefendant left, they took a black bag and went to unit 1203. Back home in his own building that evening, Gilmore encountered codefendant in the stairwell. Codefendant said, "if you say something I am going to get you."

¶ 10    On cross-examination, the APD asked Gilmore a mere nine questions and elicited testimony that Gilmore previously told the APD that his statements to the police and the grand jury were false. The APD did not otherwise challenge the plausibility of Gilmore's account before the grand jury.

¶ 11    Detective Thomas Argenbright testified that there was no sign of forced entry at the scene. A wig lay on the kitchen floor and blood was on the stove. In the bedroom, Angela, wearing a negligee, was face down on the floor, between the bed and the closet, in a pool of blood. Blood was also smeared on the walls. While Detective Argenbright was in the apartment, codefendant entered and spoke with the police. The APD did not cross-examine the detective.

¶ 12    Sergeant Daniel McDonald testified that on November 14, 1995, he interviewed Thomas, who was in custody on an unrelated case. Afterward, Sergeant McDonald was looking for defendant, codefendant and Gilmore with respect to Angela's murder. The APD did not cross-examine Sergeant McDonald either.

¶ 13    We note that while Thomas was not called to testify at defendant's trial, he previously testified at codefendant's trial. According to that testimony, he was at home at the time of the murder and remembered speaking to an ASA at some point. He denied remembering virtually anything else about their conversation, however, or giving the following account: Thomas, went to Angela's apartment because the "boys" downstairs had told him to get some marijuana. When Thomas knocked, codefendant answered. In addition, Angela and defendant were in the kitchen. After codefendant went to the back bedroom, he snapped at Angela and asked where his marijuana was. Defendant and codefendant hit Angela and dragged her to the bedroom. Codefendant also hit Angela in the head with a crowbar before giving it to defendant. At codefendant's instruction, Gilmore retrieved a butcher knife and gave it to codefendant, who

stabbed Angela all over her body. He then gave the knife to defendant. According to Thomas, he left the bedroom once the stabbing began. Defendant and codefendant put the crowbar and knife inside a plastic bag, which codefendant subsequently threw into the incinerator.

¶ 14   Detective Ryan testified that he spoke with defendant on November 15, 1995, the day after his arrest. In the presence of ASA Darman, defendant said he and codefendant went to Angela's apartment because marijuana was missing. Thomas and Gilmore followed them. When Angela answered the door, codefendant asked, "where's my bud, bitch," and hit her in the head. Gilmore grabbed Angela's hair and her wig came off. Gilmore, Thomas, and codefendant then struggled with Angela and pushed her to the back of the apartment, at which time defendant left.

¶ 15   On cross-examination, the APD asked only four questions. Detective Ryan acknowledged he did not ask defendant how long he was in the apartment, but the detective believed it could not "have been more than a minute or so" given his account. Defendant never said the marijuana was his and Detective Ryan had understood that it belonged to codefendant.

¶ 16   The parties stipulated that Angela sustained 57 separate stab wounds and 9 incised wounds. One stab wound entered behind the right ear. Others fractured her ribs and caused a chipping defect to her skull. Additionally, she sustained defensive wounds to her right hand.

¶ 17   In closing, the State argued that Gilmore's grand jury testimony was substantive evidence of defendant's guilt and was corroborated by defendant's own statement and physical evidence. In contrast, the APD argued that Gilmore's grand jury testimony was both false and forced, and Gilmore himself may have been the offender. The APD also argued that according to defendant's statement, he left before anything happened.

¶ 18   The trial court found defendant guilty of first-degree murder and imposed a 50-year sentence. At sentencing, he stated, "I didn't have nothing to do with the death of Angela Young,

but right now I wish I was in her place because I got nothing for my future for something I didn't have nothing to do with." The court expressed its belief that defendant was not the only offender and observed that codefendant was acquitted in a separate trial based on separate evidence.

¶ 19    On direct appeal, we affirmed the judgment, rejecting defendant's challenge to the sufficiency of the evidence. *People v. Butler*, 1-99-0093 (2000) (unpublished order under Supreme Court Rule 23).

¶ 20                    B. Postconviction Proceedings

¶ 21    Defendant then filed a *pro se* postconviction petition alleging that the APD was ineffective for failing to (1) procure the polygraph examiner's testimony, (2) have this matter tried sooner, and (3) prepare an affidavit under Illinois Supreme Court Rule 604 (eff. Aug. 1, 1992). Judge Leo E. Holt summarily dismissed the petition and the reviewing court affirmed, granting defense counsel's motion to withdraw pursuant to *Pennsylvania v. Finley*, 481 U.S. 551 (1987). *People v. Butler*, 1-00-4193 (2002) (unpublished order under Supreme Court Rule 23).

¶ 22    In March 2004, defendant filed a *pro se* motion for DNA testing (725 ILCS 5/116-3 (West 2004)) and was appointed counsel. The State moved to dismiss the petition two years later. On January 18, 2007, Judge Mary M. Brosnahan denied defendant's motion, finding he had not shown sufficient testing was unavailable to him before trial or that testing could potentially produce new, noncumulative evidence material to his assertion of actual innocence. Three years later, in August 2010, the reviewing court affirmed that judgment. *People v. Butler*, No. 1-07-0319 (2010) (unpublished order under Supreme Court Rule 23).

¶ 23    Defendant, through pro bono counsel, filed a second motion for DNA testing in October 2013. In 2014, absent objection from the State, Judge Brosnahan granted the motion with the caveat that the State was not conceding that testing would produce materially relevant evidence

supporting defendant's actual innocence claim. According to a July 2014 report, defendant could not be excluded as a contributor to the DNA on a swab of Angela's fingernail, which contained a mixture of DNA from five males. Defendant could not be excluded as a contributor to the DNA on the swab from the hall floor either. He was excluded, however, with respect to the DNA on the stove and the bedroom floor near the victim. Apparently lacking guidance as to the posture of his case, defendant filed a notice of appeal, which we subsequently dismissed. *People v. Butler*, No. 1-15-2020 (2016) (dispositional order). Meanwhile, the Conviction Integrity Unit of the Cook County State's Attorney's Office (CIU) began an investigation into defendant's case.

¶ 24    On October 20, 2016, defendant, through attorney Jennifer Bonjean, filed a motion for DNA-related discovery (Ill. S. Ct. R. 417(b) (eff. Mar. 1, 2001) and CIU-generated discovery. Seven months later, Judge Brosnahan entered an agreed order for DNA testing of buccal swabs submitted by Maurice Pearson, AKA "Reecy,"  Ricky Buckley, AKA "Ruler," and Aundrake Parks, AKA "Dre," who were all Gangster Disciples. According to defendant, Bonjean had provided the CIU with evidence suggesting that those individuals were potential offenders. The resulting July 2017 report excluded Parks as a contributor to all DNA samples collected in this case. In addition, Pearson was excluded as a potential contributor to the DNA found on the fingernail swab, but Buckley could not be excluded as a contributor to that sample. Furthermore, Pearson and Buckley could not be excluded as contributors to the DNA on the stove or hall floor but could be excluded from the sample taken from the bedroom floor near the victim.

¶ 25    According to defendant, in 2018, the CIU informed him that while serious questions had been raised regarding his innocence, the CIU was not prepared to move for the court to vacate his conviction.

¶ 26 On April 26, 2018, defendant, through Bonjean, sought leave to file a successive postconviction petition, which the trial court granted in January 2019. He filed an amended petition the following month. Taking issue with the APD's minimalist style, defendant cited numerous instances of his ineffectiveness. Defendant also asserted that the State failed to disclose material evidence and that newly discovered evidence showed his actual innocence.

¶ 27 Defendant asserted that the APD failed to impeach Gilmore's prior grand jury testimony with conflicting physical evidence. For example, Gilmore said Angela was stabbed with a knife, but the autopsy report showed a double-bladed weapon was used. Despite Gilmore's statement that Angela scratched codefendant in the face, he was uninjured. The APD also failed to highlight that Gilmore, a 6th grader, was interrogated without the presence of an interested adult and was not allowed to leave until he testified before the grand jury. In addition, the APD failed to present Thomas's testimony. According to a 2015 report, Thomas told the CIU that he did not witness the murder and fabricated his contrary account.

¶ 28 We note that Thomas also told the CIU, however, that defendant murdered Angela after he and codefendant argued with her about missing marijuana. In addition, Thomas had heard that Buckley and Parks were involved. When a detective picked Thomas up to go to codefendant's trial, Buckley, Parks and other Gangster Disciples stared at him. The same gangsters were in the courtroom when Thomas testified. Afterward, codefendant gave Thomas $1,000, apparently without solicitation, and thanked him for his testimony. No Gangster Disciples came to defendant's trial, however. Thomas said that the CIU should not waste its time because defendant was not innocent.

¶ 29 Defendant also alleged that the APD failed to present codefendant's testimony that "he did *not* stab Angela Young with [defendant.]" An attached 2014 CIU report stated that

codefendant said he was not involved in the murder and did not know what happened. He denied storing marijuana in Angela's apartment and stated that he and Shamika were good friends. While he knew Gilmore and Thomas, he did not spend time with them. In addition, codefendant had learned that defendant gave his name to the police. Stacy Bagaloo, Bonjean's paralegal, also provided an affidavit stating that she witnessed Bonjean's phone conversation with codefendant and heard him deny committing the murder with defendant.

¶ 30    Defendant further alleged that the APD failed to present the testimony of Farrah Hubbard, who would refute Gilmore's grand jury testimony that defendant and codefendant went to unit 1203 after the murder. According to an affidavit from Ashley Cohen, an attorney who worked with Bonjean, Hubbard stated during a 2018 phone conversation that neither Gilmore, Thomas, defendant nor codefendant came to her apartment, unit 1203, on the day in question. Her parents would not have left her home alone -she was 16 years old- and would have noticed if four boys came to their home after murdering someone. She knew nothing about Angela's death and was tired of people asking her about it.

¶ 31    We also note, however, that a supplementary police report dated November 28, 1995 (the Supplementary Report) stated that codefendant told the police that Hubbard was his girlfriend.[1] Incidentally, the same report states that codefendant identified Shamika as his girlfriend.

¶ 32    Next, defendant asserted that the State violated his right to due process under *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose evidence identifying Pearson, Buckley and Parks as potential offenders. A police report (Pearson Report) dated November 21, 1995, stated that Officer Gloria Allen-Thompson received an anonymous phone call implicating Pearson in Angela's murder. When officers arrested Pearson, he denied involvement. The officers then

---

[1]The Supplementary Report is extensive. Accordingly, we provide details from the report as needed.

contacted Detective Redmond at Area 1, who stated that Detective Argenbright and his partner, Detective George Holmes, "had clear[ed] the case by arrest, and that above offender [was] to be released without charging per further investigation."

¶ 33    Defendant also provided a 2018 affidavit from defense investigator William Dorsch. According to Dorsch, Shamika said she never believed that defendant and codefendant murdered her mother; rather, she thought that Buckley and Pearson were involved.[2] Shortly after the murder, a man and a woman, whose names she did not know, told her that Pearson was responsible. In addition, Buckley controlled a large marijuana operation in the CHA building and codefendant operated a smaller one, storing his marijuana in Angela's apartment. Shamika believed the murder was motivated by the theft of codefendant's marijuana. At a family gathering at her grandmother's house after the murder, Buckley, Pearson and Parks arrived, which was strange, and her uncle asked them to leave. She also thought it odd that Buckley and Parks attended the court proceedings against defendant and codefendant.

¶ 34    Nicole Young, another of Angela's daughters, told Dorsch that she dated Buckley at one time, and he had stored marijuana in Angela's apartment until his operation grew too large. In addition, Angela was "having problems" with Buckley and Pearson at the time of the murder. Nicole believed they intended to steal codefendant's marijuana on the night of the murder and the confrontation became violent. After the murder, she found it suspicious that Buckley, Pearson and Parks insisted on driving her to her grandmother's house. Her uncle believed they may have been involved in the murder and asked them to leave. Buckley, Pearson and Parks had also come to court proceedings in this case. At some point, Buckley told her he saw Angela with a strange man the night before the murder, but Nicole did not believe him. Furthermore, Kansas

---

[2]Shamika stated that Ruler, known as "Ricky Jones," was responsible, but she appears to have been referring to the same person identified as Ricky Buckley.

Gilmore, Earl Gilmore's sister, had said that Buckley and Pearson threatened him and his mother against giving their names to the police.

¶ 35    Finally, defendant alleged that new evidence, including the aforementioned DNA testing results, established his actual innocence.

¶ 36    In June 2019, the State moved to dismiss the petition, arguing that defendant failed to show cause and prejudice for failing to raise his ineffective assistance of counsel and *Brady* claims in his initial petition.[3] Additionally, he could not show actual innocence.

¶ 37    According to the CIU reports attached to the motion, Hubbard stated in a 2014 interview that she dated codefendant for about two months after he was released from prison, but they never discussed the murder. In 2017, Hubbard stated that she had been smoking marijuana with defendant on the morning that Angela's body was found, and she did not recall seeing marks on him. The same year, Hubbard said she did not know if defendant and codefendant sold drugs, were in a gang or were capable of violence.

¶ 38    The attached CIU reports also stated that in 2014, Shamika said Angela told her that codefendant had the key to the apartment. Various individuals had also told her that defendant and codefendant were arguing about that key on the morning of the murder. According to what appears to be an incomplete 2017 report regarding an interview with Shamika, "Tamika," codefendant's girlfriend, asked defendant what happened to his face at some point. Shamika also confirmed that defendant and codefendant sold drugs. She did not know that Angela was storing drugs, but stated it was common for women in the building to do so. In addition, she believed that older gang members were involved in Angela's murder and told defendant and codefendant to do it. Shamika had also heard that defendant stole the marijuana and blamed it on Angela.

---

[3]The motion to dismiss found in our record is out of order and incomplete.

¶ 39    The attached CIU reports further stated that in 2017, Nicole confirmed that defendant and codefendant sold marijuana in the CHA building, that codefendant stored marijuana in Angela's apartment and that he had a key to the apartment. At the murder scene, Nicole saw codefendant, but he tried to avoid her. Detectives told her on the day after the murder that they believed defendant, codefendant, Buckley, Pearson, and Parks were involved. She also learned from the medical examiner's office that DNA under Angela's fingernails was linked to defendant. While Nicole believed that Buckley, Pearson, and defendant were all involved in the murder, she did not believe codefendant would have hurt Angela. She theorized that the offenders intended to steal the marijuana and were surprised to find Angela at home.

¶ 40    In September 2019, oral arguments ensued. Almost an entire year later, Judge Brosnahan entered a written order granting the State's motion to dismiss. Defendant now appeals.

¶ 41                                II. Analysis

¶ 42    The Act provides criminal defendants with a remedy for substantial violations of constitutional rights but contemplates the filing of only one postconviction petition. *People v. Taliani*, 2021 IL 125891, ¶ 53. Any claim that could have been raised in the defendant's initial petition is forfeited. *People v. Sanders*, 2016 IL 118123, ¶ 24. That being said, fundamental fairness compels relaxing the bar against successive petitions where (1) the defendant is able to establish "cause and prejudice," or (2) the defendant makes a persuasive showing of actual innocence. *Taliani*, 2021 IL 125891, ¶ 55. A defendant must obtain leave of court to file a successive petition. *People v. Plummer*, 2021 IL App (1st) 200299, ¶ 69.

¶ 43    Where, as here, the trial court grants a defendant leave to file a successive petition, the petition is docketed for second-stage proceedings. *People v. Jackson*, 2020 IL App (1st) 143025-B, ¶ 26. At that stage, a defendant's allegations, supported by records, affidavits or other

evidence, must make a substantial showing of a constitutional violation. *People v. Dupree*, 2018 IL 122307, ¶ 28. To be clear, the Act does not limit a defendant to the use of affidavits; rather, the defendant may use any suitable evidence to establish a constitutional deprivation. *Id.* ¶ 32. In addition, the State may file a motion to dismiss or an answer to the petition. *Id*. ¶ 28. Dismissal may be sought on any grounds, including the defendant's failure to show cause and prejudice for failing to raise claims in his initial petition. *People v. Bailey*, 2017 IL 121450, ¶ 26.

¶ 44    At the second stage, courts must take all well-pleaded allegations as true, unless positively rebutted by the trial record. *People v. Robinson*, 2020 IL 123849, ¶ 45. No fact finding or credibility determinations are to be made. *People v. Domagala*, 2013 IL 113688, ¶¶ 34-35. Furthermore, final determinations as to admissibility of evidence are not to be made until a defendant has overcome the hurdles of third-stage proceedings. *Robinson*, 2020 IL 123849, ¶ 81.

¶ 45    We review the second-stage dismissal of defendant's petition *de novo*. *Dupree*, 2018 IL 122307, ¶ 29. Accordingly, we may affirm on any basis. *Sanders*, 2016 IL 118123, ¶ 55.

¶ 46                                A. Ineffective Assistance of Trial Counsel

¶ 47    On appeal, defendant first asserts that the APD was ineffective for failing to discredit the evidence against him and test the State's implausible theory that "a young teenage-boy with no criminal background possessed sufficient motive or the physical aptitude to stab a 34-year-old woman over 60 times without suffering so much as a scratch." He raises a litany of complaints derived from the APD's inaction.

¶ 48    Although the trial court granted defendant leave to file, the State argues that defendant failed to establish cause and prejudice with respect to this claim, as is required to raise it in a successive petition. To demonstrate cause, a defendant must show an objective factor external to the defense that impeded the defense's ability to raise the claim in his initial petition. *People v.*

*Jackson*, 2021 IL 124818, ¶ 30. To show prejudice, the defendant must demonstrate that the claimed error so infected his trial that his conviction violated due process. *Id*. We divide defendant's complaints into those that could have been raised in defendant's first petition, and those that could not.

¶ 49    Defendant complains that the APD (1) failed to read the police reports; (2) asked only 13 questions during the cross-examination of all witnesses; (3) failed to present the testimony of Thomas, which would have shown that detectives used dubious interrogation tactics to produce a false statement from him, thereby corroborating Gilmore's testimony that the police forced him to give a false account; (4) failed to challenge Gilmore's grand jury testimony by highlighting conflicting physical evidence and his susceptibility to police pressure as a juvenile being questioned outside the presence of a parent; (5) failed to cross-examine Detectives Argenbright and McDonald to show that Gilmore was not released from jail prior to his grand jury testimony and that his testimony was contradicted by physical evidence; and (6) failed to call codefendant to testify that he had no reason to believe that defendant was involved in Angela's murder. Yet, the evidence supporting these allegations was available at the time defendant filed his first postconviction petition, if not on direct appeal. Thus, these contentions are forfeited, and defendant cannot establish cause.

¶ 50    Defendant nonetheless contends that the APD never provided him with discovery materials, including police reports. According to defendant, it follows that he could not have raised the aforementioned allegations in his initial *pro se* petition.

¶ 51    Notwithstanding defendant's suggestion to the contrary, we find no mention of this argument in his successive postconviction pleadings and defendant on appeal has failed to direct this court to the page of the record on which that contention is made. Accordingly, it is forfeited.

Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020); *People v. Macias*, 2015 IL App (1st) 132039, ¶ 88 (stating that the failure to comply with Rule 341 results in forfeiture). We also question whether this constitutes an objective factor external to the *defense*, as required to establish cause. *People v. Jackson*, 2021 IL 124818, ¶ 30. Furthermore, while trial counsel would not have been allowed to give defendant the trial file (see Ill. S. Ct. R. 415(c) (Oct. 1, (1971)), it does not follow that counsel never discussed the materials therein with defendant. See *People v. Savage*, 361 Ill. App. 3d 750 (2005) (quoting 134 Ill. 2d R. 415(c), Committee Comments at 357) (stating that "[w]hile [the attorney] will undoubtedly have to show it to, or at least discuss it with, others, he is not permitted to furnish them with copies or let them take it from his office"). Moreover, defendant has developed no argument explaining why he could not have raised these contentions in his first petition while arguing that Rule 415 rendered supporting materials unavailable to him. See 725 ILCS 5/122-2 (West 2018) (requiring that a petition "have attached thereto affidavits, records, or other evidence supporting its allegations *or shall state why the same are not attached*" (emphasis added)).

¶ 52    Defendant also categorically asserts that he "was only able to properly plead and support an ineffective assistance of counsel [claim] after his first post-conviction attorney, Kathleen Zellner, obtained a set of police reports sometime in 2015 and only *after* the Cook County State's Attorney's office began [reinvestigation] of the case through their Conviction Integrity Unit." This sweeping statement, however, is insufficient to show that each of the distinct allegations mentioned above could not have been raised sooner. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020); *Macias*, 2015 IL App (1st) 132039, ¶ 88 (stating that "[t]he appellate court is not a depository in which the appellant may dump the burden of argument and research"). Accordingly, defendant has not established cause with respect to those claims.

¶ 53   We now turn to defendant's remaining allegations based on new evidence that could not have been the basis for a prior ineffective assistance of counsel claim. To demonstrate that trial counsel was ineffective, a defendant must show both that counsel's performance was deficient, and that this deficient performance prejudiced the defendant. *Domagala*, 2013 IL 113688, ¶ 36.

¶ 55   Relying on statements made by codefendant in 2014 and 2018, defendant asserts that the APD was ineffective for failing to present the testimony of codefendant. Codefendant told the CIU that he was not involved in the murder, did not know what happened and did not store marijuana in Angela's apartment. According to Bagaloo, codefendant told Bonjean that he did not commit Angela's murder, which would impeach the State's theory that codefendant and defendant committed the murder together. Codefendant's posttrial statements did not specify, however, whether the APD attempted to speak with codefendant following his acquittal, what codefendant would have told him in 1998 or whether codefendant would have been willing to testify on defendant's behalf. We cannot assume that codefendant would have testified in the same manner, particularly given his understanding that defendant was the person who implicated him. Accordingly, the record and attachments to defendant's petition do not make a substantial showing that counsel's performance was deficient in this regard.

¶ 56   We similarly reject defendant's assertion that the APD was ineffective for failing to present the testimony of Thomas due to statements he made in 2015. Specifically, Thomas told the CIU that he was not present during Angela's murder, that the statements attributed to him were false, that he barely knew defendant, and that he had never been inside Angela's apartment. Yet, Thomas did not tell the CIU whether the APD attempted to contact him or whether he would have been willing to speak with the APD if he had. Unlike codefendant, who was acquitted and could not have been retried due to double jeopardy principles, Thomas had not

been charged despite placing himself at a murder scene. His precarious position may have left him leery to further discuss the murder in 1998. Without knowing what interaction, if any, the APD had with Thomas, we cannot say counsel's performance was deficient.

¶ 57 Finally, defendant's assertion that the APD was ineffective for failing to present Hubbard's testimony also fails. Hubbard did not specify whether trial counsel contacted her or that she would have been willing to speak to him let alone testify on defendant's behalf. We cannot assume that she would have done so given, particularly given that she was dating codefendant and that defendant supposedly implicated him. Even if Hubbard would have been willing to talk to the APD, she did not state that her 2018 account and her account at defendant's trial would have been the same. Once again, defendant has not shown that the APD's performance was deficient in this regard.

¶ 58 To be sure, many instances of the APD's inaction in this case are questionable. Yet, those instances are procedurally barred from review, as defendant could have raised them in his initial petition. Defendant has not made a substantial showing that the APD was ineffective based on new evidence or satisfied the cause and prejudice test.

¶ 59 B. *Brady* Violation

¶ 60 Next, defendant asserts that his right to due process was violated when the State failed to disclose exculpatory evidence that two or three other offenders may have been responsible for Angela's murder.

¶ 61 Under *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the prosecution has an affirmative duty to disclose evidence favorable to the defendant. *People v. Coleman*, 183 Ill. 2d 366, 392 (1998). To establish a violation of that rule, a defendant must show that (1) the undisclosed evidence is favorable to the defendant because it is exculpatory or impeaching; (2) the State willfully or inadvertently suppressed the evidence; and (3) this suppression prejudiced the

defendant because the evidence was material to guilt or punishment. *People v. Beaman*, 229 Ill. 2d 56, 73-74 (2008). Evidence is material where a reasonable probability exists that its disclosure would have led to an acquittal. *People v. Brandon*, 2021 Il App (1st) 172411, ¶ 83. Additionally, a reasonable probability does not mean that the evidence would more likely than not result in a different verdict; rather, a reasonable probability exists if the likelihood of a different outcome is sufficient to undermine confidence in the trial. *People v. Davis*, 2012 IL App (4th) 110305, ¶ 63. Furthermore courts must consider the cumulative effect of all suppressed evidence. *Beaman*, 229 Ill. 2d at 74.

¶ 62　According to the Pearson Report, an anonymous caller told Officer Allen-Thompson that Pearson was involved in Angela's murder. Police officers then arrested Pearson. Detective Redmond at Area 1, however, subsequently informed those officers that Detectives Argenbright and Holmes "had clear[ed] the case by arrest, and that above offender [was] to be released without charging per further investigation."

¶ 63　The parties do not meaningfully dispute that the Pearson Report was in the State's possession. We also find that the report was favorable to the defense, as it impeached the State's trial theory that defendant and codefendant alone committed this offense. While DNA evidence later revealed that several people may have been involved, the State would not have been aware of this when deciding whether it needed to disclose the Pearson Report.

¶ 64　The State contends, however, that defendant has not shown that the report was concealed or suppressed. Specifically, the State argues he has failed to demonstrate that the report was not in the APD's possession absent an affidavit from him stating as such. We disagree.

¶ 65　As the State recognizes, section 122-2 of the Act requires that "[t]he petition shall have attached thereto affidavits, records, or other evidence supporting its allegations or shall state why

the same are not attached." 725 ILCS 5/122-2 (West 2018). The purpose of this requirement is to demonstrate that the defendant's allegations are subject to objective or independent corroboration. *People v. Hodges*, 234 Ill. 2d 1, 10 (2009). Our supreme court has stated, however, that "the Act permits a petitioner to make a substantial showing of a constitutional deprivation *using any suitable evidence*." (Emphasis added.) *Dupree*, 2018 IL 122307, ¶ 32.

¶ 66     Here, defendant provided the affidavit of Ashley Cohen an attorney with the Bonjean Law Group, PLLC.[4] She stated that that a third-party vendor scanned the trial file held at the Cook County Public Defender's Office and that the Pearson Report did not appear in that file. Attached to the affidavit was correspondence between Bonjean's paralegal, the Cook County Public Defender's Office, and the third-party vendor that copied the file. Contrary to the State's suggestion, Cohen's affidavit shows that she has direct, first-hand knowledge of what was in the trial file from the public defender's office in this case, as scanned with that office's approval by a third-party vendor. This supports a reasonable inference that the document did not appear in the trial file tendered to Bonjean's office because it was never there in the first place. *Cf. People v. Page*, 193 Ill. 2d 120, 160 (2000) (noting in the absence of such an affidavit that the defendant offered "no basis upon which to conclude that his trial counsel did not in fact possess these police reports").

¶ 67     The State contends that the document might nonetheless have originally been in the file or that the third-party vendor may have missed a page. Yet, we find defendant's documentation

---

[4]While the State suggests that Rule 415(c) prevents anyone other than Bonjean from attesting to every piece of discovery received, the State cites no authority for the proposition that the rule would be furthered by withholding discovery from other attorneys working on the petitioner's case or other support staff. See *Savage*, 361 Ill. App. 3d at 760 (quoting 134 Ill. 2d R. 415(c), Committee Comments at 357, ("stating that the purpose of Rule 415 is to prevent pretrial-discovery materials from becoming matters of public availability once they had been turned over to counsel'")).

is sufficient at this stage to show that the State did not tender the report to defendant. *Cf. People v. Gonzalez*, 2016 IL App (1st) 141660, ¶¶ 56-57 (finding that the attached affidavits and transcripts regarding a detective's misconduct in other cases was sufficient to survive first-stage proceedings but the petition could not survive at the second stage absent any evidence of the detective's misconduct in the case before it). We also note that the State has not attempted at this stage to affirmatively show that the State did tender the Pearson Report to the APD.

¶ 68    We reject the State's argument that its discovery answer rebuts defendant's allegation because it specified that police reports were tendered to defense counsel in open court. The State's general representation that "reports" were tendered leaves sufficient room for an omission. Additionally, while the answer to discovery listed Officer Allen-Thompson as a potential witness, it did not list Pearson. Merely listing Officer Allen-Thompson as 1 of 30 police personnel whose testimony might be presented would not have apprised defendant that Officer Allen-Thompson was involved in the identification of an alternative offender.

¶ 69    In short, we reject the State's assertion that only an affidavit from the APD will do, particularly considering that he has not been involved in this case in more than 20 years, has surely worked on hundreds of cases since then, and may or may not remember what the State tendered. See also *Dupree*, 2018 IL 122307, ¶ 32 (recognizing that petitioners are not limited to the use of affidavits). That being said, we find that the Pearson Report would not have been viewed as material at the time of the offense.

¶ 70    According to the report, an anonymous caller identified Pearson as the offender. Defendant argues that "[w]hile it is true that evidence of alternative suspects cannot be remote or speculative, the evidence offered by [defendant] was specific evidence of motive, opportunity and guilty conscience conduct by *three* individuals." (Emphasis added.) Yet, this report

mentioned only one offender, Pearson, and provided virtually no details regarding the circumstances of his participation, the identities of his accomplices or what his motive may have been. We cannot say that one barebones allegation from an unknown source would persuade a trier of fact or place the entire case in a different light. *Cf. People v. Beaman*, 229 Ill. 2d 56, 74-75, 78-81 (2008) (finding undisclosed evidence of an alternative suspect was material where he gave a false alibi, had potential motive and opportunity to commit the offense, was evasive and nervous when talking to police, failed to complete his polygraph examination, had been charged with domestic battery, had physically abused his girlfriend and had behaved erratically due to steroid use).

¶ 71    To be sure, the Pearson Report gives the distinct impression that more information was not available because the police did not want to find it. Instead, they succinctly dismissed the possibility that Pearson was an offender without further investigation. The Supplementary Report, written just a week later, concluded by requesting that the case be classified as clear and closed. That report discussed virtually every individual mentioned in our decision today with the exception of Pearson. That being said, we cannot say defendant has made a substantial showing that the undisclosed report alone was material evidence. We now turn to the remainder of the allegedly suppressed evidence, namely, the statements of Shamika and Nicole as memorialized by Dorsch in 2018.

¶ 72    According to Dorsch's affidavit, Shamika and Nicole identified Pearson, Parks and Buckley as potential offenders. Shamika stated she did not believe that defendant was one of the offenders. Both women pointed at other individuals. Yet, Shamika and Nicole did not indicate that they had shared this information with the police or with the State when this case was being investigated. Indeed, at sentencing, Shamika expressed her opinion that defendant had ruined her

life and deserved to be sentenced to the maximum extent of the law. Thus, it is not clear that the State possessed this information let alone suppressed it.

¶ 73    We conclude that defendant has failed to make a substantial showing that the State violated his right to due process by withholding one police report containing a single, vague accusation that Pearson murdered Angela.

¶ 74                              C. Actual Innocence

¶ 75    Finally, defendant asserts that he has made a substantial showing of actual innocence.

¶ 76    A freestanding actual innocence claim requires newly discovered evidence showing that the defendant did not commit the offense charged. *Taliani*, 2021 IL 125891, ¶ 56. Substantively, a court should grant relief if the defendant has presented evidence that is (1) new, (2) material, (3) noncumulative and (4) so conclusive that it would probably change the result on retrial. *People v. Coleman*, 2013 IL 113307, ¶ 84. Evidence is new where it was discovered after trial and could not have been discovered sooner through due diligence. *Id*. ¶ 97. In addition, evidence is material where it is probative of the defendant's innocence and is noncumulative where it adds to the evidence heard at trial. *Robinson*, 2020 IL 123849, ¶ 47. Furthermore, conclusiveness is the most important element of actual innocence. *Sanders*, 2016 IL 118123, ¶ 47. Conclusive means that when considered alongside the trial evidence, the new evidence probably would lead to a different result. *Robinson*, 2020 IL 123849, ¶ 47.

¶ 77    That being said, probability, not certainty, is the key in considering conclusiveness. *Coleman*, 2013 IL 113307, ¶ 97. New evidence need not be entirely dispositive for a court to find it is likely to alter the result on retrial. *Robinson*, 2020 IL 123849, ¶ 48. An actual innocence claim does not require a defendant to show total vindication or exoneration. *Robinson*, 2020 IL 123849, ¶ 55. Instead, conclusiveness concerns whether evidence supporting the petition places

the trial evidence in a different light, undermining the court's confidence in the judgment of guilt. *People v. Anderson*, 2021 IL App (1st) 200040, ¶ 56.

¶ 78      Here, the State's theory at trial was that defendant and codefendant murdered Angela. To support that theory, the State relied on Gilmore's grand jury testimony that defendant and codefendant murdered her as Gilmore and Thomas looked on. At trial, Gilmore testified that his prior account was both forced and false. See also *People v. Plummer*, 2021 IL App (1st) 200299, ¶ 113 (stating that "[t]he effects of abuse committed by law enforcement does not walk away with the offending officers"). In addition, physical evidence at trial corroborated Gilmore's grand jury testimony to the extent that Angela was stabbed numerous times, but no physical evidence corroborated Gilmore's statement that defendant did the stabbing. In fact, no evidence whatsoever corroborated that aspect of Gilmore's grand jury testimony. The only other evidence of defendant's involvement was his disavowed, unmemorialized statement, which stated that he left before any stabbing began. Furthermore, Detective Ryan testified he was under the impression that the marijuana Angela stole belonged to codefendant, leaving some question as to whether defendant would have been sufficiently motivated to repeatedly stab a woman over someone else's marijuana.

¶ 79      The evidence was sufficient, to be sure, but it left as many questions as it did answers. It was not overwhelming. We now turn to the DNA evidence.

¶ 80      According to the July 2014 report, the swab from Angela's fingernail contained a mixture of DNA from five males and defendant's DNA profile could not be excluded therefrom. Additionally, defendant's profile could not be excluded from the swab from the hall floor. His profile was excluded, however, from the DNA sample taken from the stove and on the bedroom floor near the victim.

¶ 81    The State argues that the aforementioned evidence was not newly discovered because DNA testing was available prior to defendant's trial. *People v. Wardell*, 230 Ill. App. 3d 1093, 1097 (1992) (stating that DNA testing was available as early as October 1987). In response, defendant asserts that "[a]t the time of Butler's bench trial in 1998, DNA analysis was not readily available." Defendant has cited no page of the record or legal authority supporting that proposition, however. See. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020). This unsupported blanket statement is insufficient for us to find that DNA testing was not available to defendant in 1998. In arguing that "the State cannot and does not demonstrate that DNA testing was, in fact, available to [defendant] at the time of his 1995 trial," defendant ignores that the burden lies with him, not the State.

¶ 82    Defendant also argues that DNA testing was not available to him due to the poor quality of the APD's performance. Yet, we are not persuaded by defendant's attempt to conflate two distinct legal claims, actual innocence and ineffective assistance of counsel. Furthermore, as the State observes, defendant has not asserted that trial counsel was ineffective for failing to seek DNA testing in 1998. Defendant has not shown that the aforementioned DNA evidence could not have been discovered sooner through due diligence.

¶ 83    That being said, we find that the additional July 2017 DNA evidence with respect to Buckley and Pearson was newly discovered evidence that could not have been obtained sooner through due diligence.

¶ 84    At the time of defendant's trial, the discovery given to the APD in no way suggested the possibility that Buckley and Pearson were alternative suspects. Thus, in 1998, defendant had no reason to request that their DNA profiles be compared to the samples taken from the scene. Beginning in 2004, defendant unsuccessfully pursued DNA testing with respect to his own

profile and the State does not suggest a different result may have ensued had he sought testing with respect to the profiles of Buckley and Pearson. Until the State agreed to this DNA testing, no amount of due diligence would have led to the discovery of this evidence. Accordingly, we find it was newly discovered. Moreover, this DNA evidence shows that Buckley and Pearson may have been present for the murder.

¶ 84    As of July 2017, Buckley could not be excluded as a contributor to the DNA found in the fingernail swab and neither Buckley nor Pearson were excluded from contributing DNA to the stove sample or the hall floor sample.  This evidence showing that Buckley and Pearson may have been present for and involved in the murder is consistent with other new evidence.

¶ 85    As stated, Shamika told Dorsch that she believed that Buckley and Pearson were responsible for Angela's murder, and that defendant and codefendant were not. An anonymous caller also informed the police that Pearson was the offender. We add that an individual named Tyrone Gaultney told Dorsch it was common knowledge in the building that Buckley and Pearson were involved. In addition, Shamika and Nicole told Dorsch they found it odd that Buckley and Pearson came to their grandmother's house after the murder. Nicole added that Buckley seemingly invented having seen Angela with a strange man the night before the murder, suggesting that Buckley was trying to mislead her or the investigation. Furthermore, Angela's daughters thought it odd that Buckley and Pearson attended court proceedings. Moreover, Shamika and Nicole's statements to Dorsch provided Buckley with a motive.

¶ 86    According to Nicole, who dated Buckley at one time, he stored marijuana in Angela's apartment before his operation grew too large. Shamika added that Buckley controlled a large marijuana operation in the CHA building while codefendant operated a smaller one and stored his own marijuana in Angela's apartment. In addition, Nicole stated that at the time of the

murder, Angela was "having problems" with Buckley and Pearson. She believed that Buckley and Pearson went to Angela's home to steal codefendant's marijuana and the confrontation with her became violent. Moreover, Nicole stated that after Angela's murder, Gilmore's sister, Kansas Gilmore, told Nicole that Buckley and Pearson threatened him and his mother against giving Buckley and Pearson's names to the police. The foregoing evidence is both material and noncumulative.

¶ 87    The State argues that the preceding evidence is based on inadmissible hearsay and conjecture, and that other evidence points squarely at defendant. Indeed, at one point, Nicole told the CIU that defendant, Pearson and Buckley committed the murder together. Additionally, Shamika apparently told the CIU at one point that someone named Tamika asked defendant what had happened to his face, which is consistent with Thomas's recanted statement that Angela scratched defendant. Yet, neither admissibility nor credibility determinations are to be made at this stage. *Robinson*, 2020 IL 123849, ¶ 81; *Domagala*, 2013 IL 113688, ¶¶ 34-35. Rather, we must take defendant's allegations as true unless positively rebutted by the record, which they are not. See *Robinson*, 2020 IL 123849, ¶ 60 (stating that new evidence is positively rebutted only where it is "clear from the trial record that no fact finder could ever accept the truth of that evidence, such as where it is affirmatively and incontestably demonstrated to be false or impossible").

¶ 88    Comparing the State's evidence at trial and this newly discovered evidence, we find defendant has made a substantial showing of actual innocence. The State's evidence at trial amounted to (1) Gilmore's recanted account of defendant and codefendant murdering Angela and (2) an unmemorialized inculpatory statement, which was notably inconsistent with Gilmore's recanted account.  In contrast, the aforementioned new evidence includes (1) DNA

evidence showing it was at least possible that Buckley and Pearson were the offenders, (2) consciousness of guilt behavior on the part of Buckley and Pearson, (3) prior conflict between Buckley and Angela and (4) a motive stemming from rival marijuana operations. When the two groupings are compared, defendant has made a substantial showing that that the new evidence would probably lead to a different result. This evidence places the trial evidence in a different light and undermines our confidence in the judgment. To be sure, this case may appear different still following an evidentiary hearing, but an evidentiary hearing is what justice requires at this juncture, more than 20 years since defendant first asserted his innocence. See also *People v. Martinez*, 2021 IL App (1st) 172011, ¶ 77 (stating in the context of a police misconduct claim that while certain evidence relied on by the defendant was not itself newly discovered or conclusive, the trial court should nonetheless consider it at the defendant's evidentiary hearing in seeing that justice is done).

¶ 88    We note that while certain evidence was available to defendant by the time he filed his first petition and, consequently, is not newly discovered evidence supporting an actual innocence claim in its own right, such evidence nonetheless provides relevant context for defendant's actual innocence claim and may be presented on remand.

¶ 89                                    III. Conclusion

¶ 90    Defendant failed to make a substantial showing that trial counsel was ineffective or that the State failed to disclose exculpatory evidence. He did, however, make a substantial showing of actual innocence. Accordingly, we reverse and remand this case for an evidentiary hearing.

¶ 91    Reversed and remanded.