2021 IL App (1st) 200040
No. 1-20-0040
Opinion filed December 22, 2021

THIRD DIVISION

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 08 CR 16890 |
| MARK ANDERSON, | ) ) | The Honorable Diana L. Kenworthy, |
| Defendant-Appellant. | ) | Judge, presiding. |

PRESIDING JUSTICE GORDON delivered the judgment of the court, with opinion.
Justices McBride and Burke concurred in the judgment and opinion.

**OPINION**

¶ 1       Defendant Mark Anderson appeals the denial of his motion for leave to file a successive postconviction petition.

¶ 2        Defendant was convicted after a jury trial of first-degree murder and aggravated discharge of a firearm and sentenced to a total of 51 years in the Illinois Department of Corrections (IDOC).

¶ 3        On appeal, defendant argues that he set forth a colorable claim of actual innocence based on the affidavits of two newly discovered witnesses who identified Quentin Cooper as the person who shot and killed Darryl Hart and, thus, the trial court erred in denying him leave to file his petition.

¶ 4        For the following reasons we reverse and remand to permit second-stage proceedings.

¶ 5                                    BACKGROUND

¶ 6        This court has described the evidence at trial in detail in three prior decisions, and we incorporate those decisions here by reference. *People v. Anderson*, 2012 IL App (1st) 103288, ¶¶ 5-22; *People v. Anderson*, 2015 IL App (1st) 140131-U, ¶¶ 3-15; *People v. Anderson*, 2017 IL App (1st) 143538-U, ¶¶ 4- 20, 22.

¶ 7        The State's evidence at trial established that Darryl Hart was shot and killed shortly after 2 a.m. outside of a sub shop, as the result of a conflict regarding who had the right to sell drugs there.  At 2 a.m. on July 25, 2008, defendant entered the sub shop with two friends, Centrell Jackson and Quentin

Cooper. The conflict with Hart began after Jackson sold two $10 bags of crack cocaine on what Hart believed was his turf.

¶ 8　　At trial, the State called defendant's friends, Jackson and Cooper, as well as a bystander named Ozier Hazziez. Defendant's presence at the crime scene was confirmed by all three occurrence witnesses, as well as by fingerprint and video evidence. In the present appeal, the two affidavits that defendant submitted in support of his actual innocence also attest to defendant's presence at the crime scene. However, they aver that Cooper was the shooter, not defendant. Thus, we focus here on the trial evidence concerning the identity of the shooter, rather than the evidence establishing defendant's presence at the scene.

¶ 9　　Hazziez, the bystander, was the only witness to testify at trial that defendant was the one who shot Hart. Jackson testified that he did not observe who shot Hart outside the sub shop because he (Jackson) was inside the shop at the moment of the shooting. Cooper testified before a grand jury that defendant shot Hart but recanted when on the witness stand at trial.

¶ 10　　Hazziez testified that, after finishing his job as a hotel convention worker, he went to the sub shop, arriving shortly after 2 a.m. on July 25, 2008. A man, later identified as Hart, was talking on a cell phone inside the shop. After Hazziez placed his food order, three men entered and also placed their

food order. One of the three men was a "tall, skinny man" who Hazziez identified as defendant. Another man entered, and one of the three men sold the new arrival drugs. (Jackson later testified that he was the one who sold the drugs.)

¶ 11 Hazziez testified that Hart began arguing with the three men, saying: "You don't belong around here. This is my area." Hart subsequently stepped outside, followed by Hazziez, and then defendant. Cooper was also outside. Hart and defendant continued to argue while outside, and Hart said: "You might as well shoot me." At this moment, Hart was 5 feet away from defendant, and defendant was 10 feet away from Hazziez. Defendant shot Hart, who fell to the ground. As Hazziez fled in his vehicle, he heard three more shots. Hazziez testified that he did not observe a weapon on Hart.

¶ 12 Later, at a police station, Hazziez viewed two photo arrays. From the first array, he identified Jackson as someone who was present at the shop. Although the second photo array included defendant, Hazziez was unable to identify anyone from that array as a person who was present at the sub shop. Three weeks after the offense, Hazziez viewed a physical lineup, from which he identified defendant as the shooter.

¶ 13 Detective Sylvia Vanwitzenburg testified that, while Hazziez viewed the second array, Hazziez stated that one of the individuals "looked familiar," but

4

Hazziez was not "one hundred percent sure." Hazziez stated that he would be able to identify the individual if he were to see him in person.

¶ 14        Jackson testified that he went to grade school and high school with defendant. After Jackson, Cooper and defendant arrived at the sub shop on the night of the murder, Jackson testified that he "got into an altercation" with Hart because he (Jackson) sold two bags of crack cocaine, worth $20, on what Hart believed was Hart's "turf." While Jackson was waiting at the counter for a soda, he heard three or four shots fired. After a few minutes, he went outside where he observed Hart lying on the ground. Jackson did not observe Hart with a weapon. Defendant was not outside but Cooper was,[1] and Jackson and Cooper drove home together.

¶ 15        Like Jackson, Cooper testified that he had known defendant for years and that the three of them (Cooper, Jackson and defendant) went to the sub shop on the night of the offense. However, Cooper testified that "nothing happened" while he was there. Cooper testified that there was no shooting and that he and Jackson left with defendant.

¶ 16        After Cooper's testimony, the State introduced a written statement signed by Cooper, as well as his grand jury testimony. Cooper had previously stated that defendant had reached around Cooper to shoot Hart and that defendant had

---

[1] Both Jackson and Hazziez testified that Cooper, who defendant now asserts was the shooter, was outside during the time of the shooting.

also fired at "another guy." At trial, Cooper testified that he signed the statement and testified before the grand jury because a detective told him that he would be charged with the murder if he did not cooperate. The State called a Chicago police detective who had spoken with Cooper, an assistant State's attorney (ASA) who had recorded Cooper's statement, and the ASA who had presented Cooper before the grand jury; and they all testified that they had not coached or threatened Cooper.

¶ 17    The State's evidence established that a jacket recovered from the scene contained a cigarette with defendant's fingerprint. The parties stipulated that the cuffs of the jacket were tested for gunshot residue and that the tested areas "may not have been in the environment of a discharged firearm."

¶ 18    At trial, defendant exercised his right not to testify or call witnesses.

¶ 19    On August 18, 2010, a jury found defendant guilty of the first-degree murder of Hart, the attempted first-degree murder of Hazziez, and the aggravated discharge of a firearm.  The trial court merged the aggravated discharge of a firearm conviction with the attempted murder conviction. On October 8, 2010, defendant was sentenced to a total of 71 years, which included:  20 years for the first-degree murder with a 25-year firearm enhancement, and a consecutive 6-year sentence for the attempted murder, with a 20-year firearm enhancement.  Defendant appealed, and this court reversed

the attempted murder conviction and remanded for a new trial on just that charge. *Anderson*, 2012 IL App (1st) 103288, ¶ 67. Instead, the State nol-prossed that charge on remand, and the trial court resentenced defendant to a total of 51 years.

¶ 20    Defendant's first postconviction petition alleged ineffective assistance of counsel and was dismissed at the first stage. The dismissal was affirmed on appeal in an unpublished order. *Anderson*, 2017 IL App (1st) 143538-U, ¶ 1.

¶ 21    On August 15, 2019, defendant sought to file a successive *pro se* postconviction petition with three affidavits attached. The three affidavits were from: (1) defendant; (2) Michelle Minniefield, and (3) Jason Burns.

¶ 22    Defendant's affidavit, dated May 24, 2019, averred "that I did not shoot and kill Darryl Hart on July 25, 2008[,] and that I'm innocent."

¶ 23    Minniefield's affidavit, dated January 4, 2018, also asserted: "he's innocent." Specifically, her affidavit averred:

"On July 25, 2008[,] at approximately 2 a.m. I was coming from my friend's house with another friend of mine. We were walking out towards 71st and Jeffrey to catch the bus and as we were walking I seen [*sic*] several men standing in front of Orbitz Submarine Shop. As I got closer I then noticed [defendant] and his friend Centrell [Jackson] from around the neighborhood. I didn't like [defendant] to[o] much because

7

him [*sic*] and my brother had several altercations. So as we were about to walk past one of the guys that was out there[,] a dark heavy[-]set guy whom I also seen [*sic*] from the neighborhood pull[ed] out a gun and shot one of the men in front of the store. I instantly turned around and ran in the opposite direction. I never talked to the police because I really didn't want to get involved in the situation. Then one day I had heard from a friend that [defendant] was in jail for the shooting that I had seen that night. I [am] writing to help [defendant] because I know he's innocent of this crime. That's why I am now coming forward to help him."

¶ 24    Like Minniefield, Burns also averred that a heavy-set man was the shooter but Burns identified the shooter by name as Quentin Cooper. Burns' affidavit, dated April 2, 2018, stated:

"On July 25th, 2008, I (Jason Burns) was visiting my girlfriend's friend on 71st & Euclid when I decided to go to the restaurant across the street[,] Orbitz Sub Shop. As I walked outside I noticed [defendant] Mark Anderson whom I had a previous altercation with standing in front of the restaurant with 3 other men[2] so I decided to wait for the crowd to

_____

² Burns does not identify the "3 other men" who defendant was standing with. Later in his affidavit, Burns avers that Quentin Cooper shot one of the men, thereby apparently accounting for two of the three men: (1) Cooper; and (2) the victim. However, the third man remains unidentified in Burns' affidavit, although

clear[,] not wanting another altercation. While standing in front of the building waiting on the crowd to clear[,] I saw [defendant] walk inside the restaurant & a few minutes after he exited[,] a heavy[-]set dark[-]skinned man who I also know to be Quentin Cooper pulled out a gun & shot one of the men that was out there with them. He also shot 2 or 4 additional times in the direction of [defendant] & the other guy that was with them. I went back inside the building & even though I saw the incident that occurred, did not contact the police because I did not want to get involved. A couple [of] months later[,] I heard that [defendant] had been locked up for the shooting. Although I did not see [defendant] shoot anybody[,] I did not contact the police due to the fact that at the time [defendant] & I were dating the same girl who we had a verbal & physical altercation over & we did not like each other. Because of this[,] I felt there was no reason to come forward. It wasn't until I recently received 35 year[s] for 1st degree murder & I talked to & saw [defendant] that I decided to come forward."

¶ 25    Referring to Minniefield's and Burns' affidavits, defendant's motion for leave to file asserted: "Both newly discovered affidavits support [defendant's] claim of actual innocence." However, defendant's petition argued: "Affidavits

---

Burns does aver that, after Cooper shot the victim, Cooper shot "in the direction of" defendant and this "other guy that was with them."

from Michelle Minniefield, Jason Burns and Charles Johnson all identify another man as being the shooter." Defendant's brief to this court concedes that there were, in fact, only two affidavits submitted from other witnesses. His brief explains: "Though [defendant's] motion refers to three affidavits, he did not receive the third affidavit attesting to his innocence until after his motion was filed."

¶ 26 Although defendant's motion and one-line affidavit asserted his actual innocence, his petition set forth ineffectiveness claims, namely, the ineffectiveness of his trial counsel for failing to obtain an expert witness concerning eyewitness identifications, and the ineffectiveness of his appellate counsel for failing to raise this issue on appeal. On the current appeal, defendant has abandoned his ineffectiveness claims and argues only a claim of actual innocence.

¶ 27 On November 1, 2019, the trial court issued a six-page order denying defendant leave to file his petition. The order observed that defendant "filed the instant post-conviction petition alleging ineffective assistance of trial counsel and appellate counsel." After examining both of these claims, the court found that these claims did not merit leave to file. Since these claims are not at issue on this appeal, there is no need to reiterate the trial court's reasoning here.

¶ 28    On November 27, 2019, defendant placed a *pro se* notice of appeal in the institutional mail of his prison, and the notice was received and filed by the trial court on December 9, 2019. In a written order dated December 20, 2019, the trial court found that defendant's notice of appeal was "timely per proof of service," and this appeal followed.

¶ 29                                  ANALYSIS

¶ 30                          I. An Actual Innocence Claim

¶ 31    Defendant submitted his petition pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2018)), which provides a statutory remedy for criminal defendants who claim that their constitutional rights were violated at trial. *People v. Edwards*, 2012 IL 111711, ¶ 21.

¶ 32    Although our supreme court has made clear that the Act contemplates only one postconviction proceeding, "[n]evertheless, [the supreme] court has, in its case law, provided two bases upon which the bar against successive proceedings will be relaxed." *Edwards*, 2012 IL 111711, ¶ 22. Those two bases are: (1) cause and prejudice and (2) actual innocence. *Edwards*, 2012 IL 111711, ¶¶ 22-23. Thus, the bar against successive petitions is overcome if defendant can (1) satisfy the *Pitsonbarger* cause and prejudice test (*People v. Pitsonbarger*, 205 Ill. 2d 444, 459 (2002); 725 ILCS 5/122-1(f) (West 2018)) or (2) show evidence of actual innocence. *People v. Sanders*, 2016 IL 118123,

¶ 24. Defendant, who is attempting to file a successive petition, has alleged only actual innocence.

¶ 33  The evidence supporting an actual-innocence claim must be (1) new, (2) material and noncumulative, and (3) of such a conclusive character that it would probably change the result on retrial. *People v. Allen*, 2015 IL 113135, ¶ 22; *People v. Coleman*, 2013 IL 113307, ¶ 96. "New means the evidence was discovered after trial and could not have been discovered earlier through the exercise of due diligence." *Coleman*, 2013 IL 113307, ¶ 96.

¶ 34  "Material means the evidence is relevant and probative of the petitioner's innocence." *Coleman*, 2013 IL 113307, ¶ 96. To be material, the evidence "need not, standing alone, exonerate the defendant; rather, it must tend to 'significantly advance' his claim of actual innocence." *People v. Stoecker*, 2014 IL 115756, ¶ 33 (quoting *People v. Savory*, 197 Ill. 2d 203, 213 (2001)). "Noncumulative means the evidence adds to what the jury heard." *Coleman*, 2013 IL 113307, ¶ 96. In the case at bar, the State concedes that defendant's proposed evidence is material and noncumulative. *People v. Ortiz*, 235 Ill. 2d 319, 335-36 (2009) (an eyewitness account that "directly contradicted the prior statements of the two eyewitnesses for the prosecution" was material and noncumulataive).

¶ 35    Conclusive means that the additional evidence, "when considered along with the trial evidence, would probably lead to a different result." *Coleman*, 2013 IL 113307, ¶ 96. "Probability, not certainty, is the key ***." *Coleman*, 2013 IL 113307, ¶ 97. A piece of new evidence is conclusive if it "would probably change the result on retrial, either by itself or in conjunction with" other new evidence also presented by the petitioner. *Sanders*, 2016 IL 118123, ¶ 53; *Coleman*, 2013 IL 113307, ¶¶ 104-08 (considering together the statements of all the new witnesses presented by the defendant).[3]

¶ 36                              II. Standard of Review

¶ 37    Defendant is first seeking leave of court to file his petition. "[L]eave of court to file a successive postconviction petition should be denied only where it is clear from a review of the petition and attached documentation that, as a matter of law, the petitioner cannot set forth a colorable claim of actual innocence." *Sanders*, 2016 IL 118123, ¶ 24.

¶ 38    It is presumed that the new evidence will contradict the evidence of defendant's guilt at trial; otherwise "the purpose of the Act would be rendered meaningless." *Robinson*, 2020 IL 123849, ¶ 57. "For new evidence to be

---

[3]Our supreme court has "specifically rejected the total vindication or exoneration standard" set forth in the lower court opinion of *People v. Savory*, 309 Ill. App. 3d 408, 415 (1999). *People v. Robinson*, 2020 IL 123849, ¶ 55 (citing *Savory*, 197 Ill. 2d 203, 213 (2001) (specifically rejecting the "complete vindication" standard set forth in the lower court's opinion)).

positively rebutted" at the leave-to-file stage, "it must be clear from the trial record that no fact finder could ever accept the truth of that evidence, such as where" the trial record "affirmatively and incontestably demonstrate[s]" the new evidence "to be false or impossible." *Robinson*, 2020 IL 123849, ¶ 60. As an example of what would rise to the level of false or impossible, the supreme court cited a case where the new evidence asserted that the victim had been shot only once, but the autopsy evidence at trial established that he had been shot multiple times. *Robinson*, 2020 IL 123849, ¶ 59 (discussing *Sanders*, 2016 IL 118123, ¶ 59).

¶ 39        Once leave to file a successive petition is granted, the petition is docketed for subsequent second-stage proceedings. *Sanders*, 2016 IL 118123, ¶ 28. Thus, at this earlier leave-to-file stage, the petition does not have to make the "substantial showing" that will later be required at a second-stage hearing, after counsel has been appointed. *Robinson*, 2020 IL 123849, ¶ 58.

¶ 40        When no evidentiary hearing has been held, as in the case at bar, a reviewing court's standard of review is *de novo*. *Sanders*, 2016 IL 118123, ¶ 31; see also *Robinson*, 2020 IL 123849, ¶¶ 38-39 ("the denial of leave to file a successive postconviction petition premised on a claim of actual innocence" is *de novo*). *De novo* consideration means that we perform the same analysis that a

trial judge would perform. *People v. Carrasquillo*, 2020 IL App (1st) 180534, ¶ 107.

¶ 41    As an initial matter, the State asserts that defendant's *pro se* petition failed to assert an actual innocence claim.  We do not find this argument persuasive because, first, the sole point of defendant's one-line affidavit is to assert his actual innocence. Second, the sole purpose of his two supporting affidavits is to assert defendant's innocence and support his actual innocence claim.  Third, his motion for leave to file argues:  "Both newly discovered affidavits support [defendant's] claim of actual innocence."  Fourth, since our review is *de novo*, we owe no deference to the trial court, and we perform the same analysis that the trial court would have done, if it had examined this claim. *Carrasquillo*, 2020 IL App (1st) 180534, ¶ 107.  Thus, we proceed to consider defendant's actual innocence claim.  *Carrasquillo*, 2020 IL App (1st) 180534, ¶ 107.

¶ 42                                   III. Conclusive

¶ 43    Since the "conclusive character of the new evidence is the most important element of an actual innocence claim," we address it first. *Robinson*, 2020 IL 123849, ¶ 47.

¶ 44    We must accept the averments in the proposed affidavits as true, unless "no fact finder could ever accept the truth of that evidence," such as where an

affiant asserts the victim was shot only once and the autopsy report establishes that he died from multiple gunshot wounds. *Robinson*, 2020 IL 123849, ¶ 60. "Credibility findings" and determining whether a witness is "reliabl[e]" may not be made at this stage but must wait for a third-stage evidentiary hearing. *Robinson*, 2020 IL 123849, ¶ 61.

¶ 45                                    A. Minniefield's Affidavit

¶ 46        Minniefield's affidavit avers that she and a friend were walking toward the corner of 71st Street and Jeffrey Boulevard, in order to "catch" a bus. Jefferson Boulevard is a north-south street, and 71st Street is an east-west street, and the sub shop where the crime occurred is on 71st Street, just west of the intersection. If Minniefield was walking toward the intersection, as she avers, and "about to" pass the shop, as she also avers, then she was walking east on 71st Street.

¶ 47        Minniefield avers, as she was walking, she observed several men standing in front of the sub shop. She avers that, as she drew closer to the shop, in her walk toward the bus stop, she was able to observe defendant and Jackson. When she arrived in the point in her walk when she was "about to walk past" the shop, she witnessed the shooting "in front of the store." The shooter was not defendant but "a dark heavy[-]se guy," who she also knew from the

neighborhood. When the shooting began, she "instantly turned around and ran in the opposite direction," which would have been west on 71st Street.

¶ 48    The State argues that none of the other evidence at trial indicates that a woman and another person walked past the sub shop at any point before, during or after the shooting. However, this argument mischaracterizes Minniefield's affidavit. She did not aver that she walked past the shop; rather, she averred that she was "about to" walk past it but, when the shooting occurred, she instantly turned around and ran in the opposite direction.

¶ 49    The State argues that Minniefield averred that Jackson was outside the shop during the shooting, while all the other evidence at trial established that he was inside the shop when shots were fired. Again, this argument mischaracterizes Minniefield's affidavit. Minniefield's affidavit indicates that, as she was walking east, she observed Jackson outside the shop. As she continued walking and drew even closer, the shooting occurred. She does not aver that Jackson was outside the shop at the moment the shots were fired.

¶ 50                    B. Burns' Affidavit

¶ 51    Burns avers that he was visiting a friend who lived near the corner of 71st Street and Euclid Avenue. This corner is almost directly across the street from the sub shop, and Burns averred that he decided to go to the sub shop "across the street." However, when Burns walked outside, he observed

defendant standing outside the shop with three other men, and he decided to wait "for the crowd to clear." While waiting across the street, Burns observed defendant walk inside the shop and exit it again. Burns was paying particular attention to defendant because Burns had previously had an "altercation" with defendant. Defendant was the reason that Burns had decided to wait, rather than cross the street to the shop. A few minutes after defendant exited the shop, Burns observed "a heavy[-]set dark[-]skinned man," whom Burns knew to be Quentin Cooper, pull out a gun and shoot another man. Cooper also shot two or four times in the direction of defendant and another man who was also out there. After the shooting, Burns "went back inside" the building that he had just exited.

¶ 52    The State argues that the evidence at trial establishes that the second person whom the shooter aimed at was not defendant but Hazziez, thereby contradicting Burns' affidavit. This argument flies in the face of a prior opinion by this court, where we overturned defendant's conviction for the attempted murder of Hazziez. *Anderson*, 2012 IL App (1st) 103288, ¶ 67. We overturned defendant's conviction because the jury instruction regarding this offense was confusing and "the evidence regarding whether defendant fired the gun in the direction of Hazziez was closely balanced." *Anderson*, 2012 IL App (1st) 103288, ¶ 66. We found that a reversal was required where "the jury could

have found that defendant attempted to kill, and then succeeded in killing Hart," rather than attempting to kill someone else. *Anderson*, 2012 IL App (1st) 103288, ¶ 66. An argument that the evidence establishes a fact, when we reversed, in part, due to close evidence on just that fact, is not a persuasive argument.

¶ 53                                    C. Other Evidence at Trial

¶ 54          If Burns' and Minniefield's affidavits are believed, as we must do at this early stage, they would provide two eyewitnesses that Cooper was the shooter, not defendant. Both Jackson and Hazziez testified that Cooper was outside the shop at the time of the shooting. In his written statement, Cooper claimed that defendant actually had to reach around him in order to shoot Hart. However, the forensic evidence introduced by the State at trial indicated that defendant's jacket "may not have been in the environment of a discharged firearm."

¶ 55          The State had two eyewitnesses to the murder: the bystander, Hazziez, who was initially unable to identify defendant as the shooter; and the recanting Cooper, who testified at trial that "nothing happened" while he was there. At trial, Cooper testified that he arrived with defendant and left with defendant, and that no shooting occurred at all.

¶ 56          "[T]he conclusive character element requires only that the petitioner present evidence that places the trial evidence in a different light and

undermines the court's confidence in the judgment of guilt." *Robinson*, 2020 IL 123849, ¶ 56. If believed, these two new eyewitnesses place the trial evidence in an entirely different light.

¶ 57                                    IV. Newly Discovered

¶ 58        Next, we examine whether the evidence was newly discovered, since the State concedes that the affidavits are material and noncumulative.

¶ 59        Before we examine the affidavits themselves, we observe that the State argues for an outdated definition of "newly discovered" that our supreme court has affirmatively rejected. The State cites *People v. Barnslater*, 373 Ill. App. 3d 512, 523 (2007), and related cases for the proposition that it is the facts that must be newly discovered rather than the evidence of those facts. The State argues that,"[s]ince defendant was present during the shooting, the identity of the shooter was known to him" and, thus, this fact is not newly discovered. However, our supreme court has found that an affidavit is still newly discovered, even when the defendant knew of the witness earlier and knew what facts the witness could testify to, if no amount of due diligence could have forced that witness to come forward and swear to those facts earlier. *Edwards*, 2012 IL 111711, ¶ 38; *People v. Fields*, 2020 IL App (1st) 151735, ¶ 48.

¶ 60          For evidence to be newly discovered, it must be that the evidence "could not have been discovered earlier through the exercise of due diligence." *Coleman*, 2013 IL 113307, ¶ 96.

¶ 61          The State argues that, since defendant was present, he must have known who was also present. Burns avers that he was waiting in front of a building across the street, when he witnessed the shooting. This court may take judicial notice of the fact that 71st Street is a major thoroughfare, with double train tracks running down the center of it. Burns avers that, after the shooting, he "went back inside" the building that he had just exited.

¶ 62          The State does not explain why defendant would have been scanning the other side of a wide thoroughfare, or how defendant could have observed Burns immediately after the shooting, when Burns averred he ducked back inside a building. Similarly, the State does not explain why defendant would have taken note of Minniefield, who had not yet walked past the shop, and who, like Burns, immediately turned and fled.

¶ 63          If an unknown, unobserved and unrecorded witness chooses not to come forward, there is no amount of due diligence that can force him or her to come forward to "get involved." See *Fields*, 2020 IL App (1st) 151735, ¶ 48. Minniefield avers that she did not contact the police because she "really didn't want to get involved." She explained that she was "now coming forward"

because she heard that defendant was in jail for the shooting, and she wanted to help him because she knew he was innocent.

¶ 64      Like Minniefield, Burns avers that he did not contact the police "because [he] did not want to get involved." A couple of months after the shooting, Burns learned that defendant had been arrested for the shooting but Burns did not contact the police because "at the time [defendant] & I were dating the same girl," and Burns and defendant had "a verbal & physical altercation over" her. Because of this, Burns did not like defendant and "felt there was no reason to come forward." However, Burns "recently" talked to defendant and "decided to come forward."

¶ 65      "If 'no amount of [due] diligence by defendant could have compelled [the witness] to testify to the statements in his affidavit' at trial, then the affidavit constitutes newly discovered evidence." *Fields*, 2020 IL App (1st) 151735, ¶ 48 (quoting *People v. White*, 2014 IL App (1st) 130007, ¶ 22). In the case at bar, where the two new eyewitnesses did not previously admit to witnessing the shooting, where it is unlikely that defendant or others would have observed or noticed them, and where they insured their anonymity by their immediate flight from the scene, we find that defendant has satisfied the low bar at this stage for alleging newly discovered evidence. See *Ortiz*, 235 Ill. 2d at 334 (eyewitness was newly discovered where he previously "did not admit to

*** having witnessed the incident," where he "would not have been seen by defendant," and where he left the area).

¶ 66                                   CONCLUSION

¶ 67        Where defendant has satisfied the very low bar at this stage for two of the three requirements, and the State has conceded the third, we must reverse and remand for docketing of this petition to permit second-stage proceedings to go forward.

¶ 68        Reversed and remanded.

---

**No. 1-20-0040**

---

| | |
|---|---|
| **Cite as:** | *People v. Anderson*, 2021 IL App (1st) 200040 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 08-CR-16890; the Hon. Diana L. Kenworthy, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Arianne Stein, of State Appellate Defender's Office, of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, Brenda K. Gibbs, and Amy M. McGowan, Assistant State's Attorneys, of counsel), for the People. |

---