2023 IL App (2d) 220196-U
No. 2-22-0196
Order entered February 3, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) | |
| v. | ) ) | No. 04-CF-1069 |
| MUHAMMAD ABDULLAH, | ) ) ) | Honorable Patricia S. Fix, |
| Defendant-Appellant. | ) | Judge, Presiding. |

PRESIDING JUSTICE McLAREN delivered the judgment of the court.
Justices Schostok and Birkett concurred in the judgment.

**ORDER**

¶ 1    *Held*:  We affirm the trial court's denial of defendant's motion for leave to file a successive postconviction petition. Defendant did not demonstrate a colorable claim of actual innocence based on two witnesses' affidavits because the evidence was not newly discovered. The trial court is affirmed.

¶ 2    Defendant, Muhammad Abdullah[1], appeals from an order of the circuit court of Lake County denying him leave to file a successive petition for relief under the Post-Conviction Hearing

---

[1] The indictment, mittimus, and notice of appeal list defendant's name as Abdullah Muhammad. However. our previous rule 23 order listed defendant as Muhammad Abdullah, and

Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2020)). Defendant contends he presented a colorable claim of actual innocence based on the affidavits of Robert Bunch and Jeremy Cooper. For the reasons set forth below, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4      In the afternoon of March 15, 2004, Marco Wilson was shot to death and Luis "Speedy" Melendez was shot in the back in front of 1821 Greenfield in North Chicago.

¶ 5      Following a 2005 trial, a jury convicted defendant of the first degree murder of Marco Wilson, the attempt first degree murder of Luis Melendez, and aggravated battery with a firearm. The court ultimately sentenced defendant to consecutive terms of 50 years' imprisonment for first degree murder and 26 years for attempted first degree murder. We affirmed on direct appeal. *People v. Abdullah*, No. 2-06-0086 (unpublished summary order under Illinois Supreme Court Rule 23(c)).

¶ 6                                  A. Trial Proceedings

¶ 7      Luis "Speedy" Melendez testified that he was a Four Corner Hustler and had been for four years. At approximately 2:00 p.m. on March 15, 2004, he was at the Alexander family house on Greenfield in North Chicago, shooting dice with a group of people, most of whom he did not know. He left with his girlfriend to get some food. Upon their return, Melendez walked toward the front of his girlfriend's car when he heard someone say, "What up now, Bitch?" He did not recognize the man and ignored him. The man then punched Melendez in the jaw; Melendez dropped his food and wrestled with the man. As he fought this man, he heard a car pull up and the voice of his best friend, Marco Wilson. He also heard defendant's voice. He then heard four or five gunshots and

_____

defendant represents that his name is Muhammad Abdullah. Therefore, we refer to defendant as such.

passed out.

¶ 8     When Melendez awoke, he saw three friends loading Wilson into a car. A gold car with tinted windows drove by and shot in the direction of the people carrying Wilson. Melendez pulled a .357 magnum revolver from his pocket and fired toward the gold car. He then went into the alley and threw the gun in a garbage can. He returned to the front of the house and passed out. Melendez had been shot in the back, between his shoulder blades; the bullet exited under his left arm pit. The bullet also broke three ribs and punctured a lung. Prior to being shot, he had not drawn his gun and had not seen anyone else draw a weapon. He did not see a weapon anywhere around Marco Wilson.

¶ 9     During cross-examination, Melendez admitted to convictions for retail theft and felony possession of firearms He also admitted that he did not tell police on the day of the shooting or the following day that he had a gun with him at the time of the shooting. When he was on the ground wrestling, he did not hear a gun being cocked. He heard four or five rapid gunshots but did not know who shot him or how he got shot. Wilson fell four to five feet away from him. Melendez lied to police when he told them that he retrieved his gun from under the seat of a car; the gun had been in his pocket.

¶ 10    Demetrious Linder testified that he and his brother Bashir were walking on Greenfield toward 18th Street by their friend "Tom's" house when they saw "Speedy" Melendez get out of his girlfriend's car with food in his hands. A dark-skinned man walked up to Melendez and asked him something, and they started fighting. Demetrious was only six to eight feet away from Melendez and the other man as they fought on the ground. Marco Wilson then ran up to Melendez and the other man, who were on the ground. A lot of other people, including a "light-skinned guy," approached the fighters. The light-skinned man, subsequently identified as defendant, pulled out a pistol and pointed it at Wilson, who had nothing in his hands. Demetrious then heard Wilson say, "Shoot" three or four times as he faced defendant. Defendant shot Wilson, who then fell.

Demetrious ran away. He heard, but did not see, other shots fired. On March 15, Demetrious told police that he did not see the shooting take place. He was shocked and "didn't like the police," so he told them something "to get them out of [my] face." Demetrious was "cool" with Melendez and had been friends with Wilson. He denied being a Four Corner Hustler. He never saw Melendez with a gun.

¶ 11    Bashir Linder testified that on the day of the shooting at about 2:20 p.m. he and his brother were on Greenfield and 18th streets. They were there because they wanted to shoot dice. When Bashir got out of the car, he saw a lot of people standing out on the street. He saw someone run up to "Speedy" Melendez, who was standing on the sidewalk, and swing at him. As they fought on the ground, Wilson pulled up in a car, jumped out, and "tried to help Speedy off the ground." Bashir saw defendant pull out a gun, point it at Wilson, and fire. Wilson had nothing in his hands. Bashir then ran away.

¶ 12    Bashir was perhaps ten feet away from Melendez as he wrestled with the other man. The two fought for "about a minute" before Bashir saw defendant. Melendez was on his stomach, underneath the other man.

¶ 13    Leo Presley testified that he was playing dice inside the Alexander house on Greenfield when he saw a group of people walk past the house. Someone then said that "[s]omebody just stole on Speedy." As Presley ran outside, he heard a shot. He saw Wilson lying on top of Melendez and a crowd of people around them. He saw defendant right beside them, pointing an automatic gun at them, then heard another shot. He saw no one else with a gun at that time. Presley helped pick up Wilson and put him in a car; he did not see a gun on or near Wilson's body. Melendez, who had jumped up and said that he had been shot, "got ahold of his gun and started shooting back." Presley saw no guns other than those used by defendant and Melendez.

¶ 14    On cross-examination, Presley testified that defendant fired five or six shots at Wilson and

Melendez. Three days after the shooting, he told Detective Diez that defendant had fired at least 30 shots. When shown a picture of Melendez's gun, Presley said that he had never seen that gun before. On redirect, Presley testified that he estimated that he heard a total of 30 shots fired. This included the first shot he heard, "a rapid set of shots" that he saw defendant fire, Melendez's shots, and shots fired by defendant as he went to his car. Presley was friends with Wilson, Melendez, and defendant. On recross, Presley testified that defendant fired around 30 shots.

¶ 15    Timothy Wiltberger testified that on the day of the shooting he was working on a telephone box on the back of a house near the incident. He heard a "series of pops" that he assumed were gunshots. He heard "about three and then it was a pause and then there was [sic] a few more. I don't know exactly. Maybe three to four" more pops were heard.

¶ 16    Donald Burns testified that he lived at 1833 Greenfield. At about 2:25 pm on March 15, 2004, he heard what he thought was "somebody banging on something," then realized the sounds were gunshots. He could not say how many shots he heard, but he described the sounds as, "pow, pow and then it was a couple of shots after that."

¶ 17    Officer Salvatore Cecala of the North Chicago police department testified that he went to the scene of the shooting as an evidence technician. He found three spent shell casings within a five-foot radius of blood stains: one by the curb, one on the parkway, and one on the street. All three were 9-millimeter Luger casings. He also recovered a large-caliber bullet fragment in the street. A detective directed him to a garbage can behind 1822 Greenfield, where he recovered a chrome-plated .357 magnum revolver containing six spent 38 caliber shell casings. The rimless shell casings that he had recovered on the curb, street and parkway could not have come from the revolver. No bullet was recovered from Melendez's body, and they were unable to determine the caliber of the bullet removed from Wilson's body.

¶ 18    Defendant testified that, on the afternoon of March 15, 2004, he received a telephone call from his friend, Jamiel Amlet, asking him to come get him because someone was shooting at him. Defendant got a ride with another friend, Anton Thompson, and drove to Greenfield, about five minutes away. He saw a group of men around Amlet, kicking him. He then saw Wilson, about 15 to 20 feet away, get out of a car and stuff a gun into his pants. Defendant jumped out of the car with a gun that belonged to Thompson and ducked down behind the back of the car. First Wilson, then defendant walked about 15 to 20 steps toward Amlet and Melendez. Defendant saw Wilson try to pull the gun from his waistband, and he yelled three times to Wilson, "Don't do it." Wilson, who was about five feet away from defendant, pulled out his gun. Defendant shot; he thought he shot only once, but he was scared, and it happened very fast. He never shot at, or shot, Melendez, who was between defendant and Wilson. Wilson's gun discharged as he pulled the gun from his waistband, and he shot Melendez in the back. Wilson then fell on top of Melendez. Defendant then picked up Amlet and ran away. He went to Wisconsin for several months. Defendant was shown a photo of the revolver found in the garbage can, and he identified it as the gun that Wilson pulled from his waistband.

¶ 19    During cross-examination, defendant testified that he shot at Wilson first. Defendant also testified that Wilson "shot first, that's when I shot." Defendant admitted that he lied when he told police that he had gone to Georgia after the shootings and that he was "not anywhere near Greenfield Avenue" at the time of the shootings. He also admitted to lying to police about his activities prior to 2:30 p.m. on March 15. He told police that the gun he used on March 15 was a "regular semi-automatic." After he shot Wilson, he threw the gun in the car and ran away; however, he told police that he had disposed of it, and he did not know where it was.

¶ 20    Stephen Newton, Chief Deputy Coroner with the Lake County coroner's office testified that he completed a presumptive gunshot residue kit on Wilson's body before removing it from

the hospital. That test had a positive result for gunshot residue on Wilson's hands. That test was not a conclusive test and could yield false positives. In examining Wilson's hands, he saw no debris around the area where residue would have been collected.

¶ 21   In rebuttal, the State presented Detective Frederick Diez of the North Chicago police department, who testified that he interrogated defendant in Kenosha, Wisconsin on September 1, 2004. Defendant first gave Diez a timeline of activities on March 15 that made no mention of the shootings on Greenfield and included his traveling to Georgia on that date. When Diez told defendant that he did not believe the story, defendant gave another statement.

¶ 22   Defendant told Diez that he received a call from Amlet that Melendez and other Four Comer Hustlers had shot at him. After defendant and another man picked up Amlet, they met another friend and proceeded to Greenfield Avenue to confront the Four Corner Hustlers. Before getting out of the car, defendant stuck a Tech-9 9-millimeter Luger parabellum semiautomatic weapon in his pants. After Amlet and Melendez got into a fight, defendant saw Wilson get out of a car and stuff some unknown item into his pants. Defendant never saw anyone other than Melendez fighting with Amlet, although other people were near the fight. Defendant pulled out his gun when he saw Wilson approach the altercation with his hand over what he thought was a gun. Defendant said, "Don't do it. We could fight." As Wilson pulled out his gun, it went off. Wilson tried to take away defendant's gun, but defendant fired at least two shots and shot Wilson.

¶ 23   The court admitted defendant's handwritten signed statement, dated September 1, 2004, substantively, as agreed by counsel. Defendant wrote the following:

> "Me and Ton was riding around No. Chicago when my Cell Phone rings it was Jemiel; he said Big Bra where you at they Shooting at me; I said who; he said them 4's. So me and Ton do find Jemiel; he gets in the car and we went to Prospect St. That's when we meet up with Tony. So we like let's go over there to see what's going on. When we got

there (Greenfield) Jemiel and Speedy got to fighting. Then I seen Marco getting out of the back seat of the car and he was stuffing something down his pants under his shirt. But, when Marco got out he started walking toward Jemiel & Speedy plus it was like 4 or 5 little 4's out there as well. So, yes, I'm scared. I told Marco, 'Don't pull it, don't do it.' He looked at me and started walking to me reaching in his pants. I seen the handle of his gun so I pulled my gun out first and told him again 'don't do it man we can fight.' He did not want to fight he wanted to shoot. So, when he walked up on me he tried to take my gun and shoot me[.] But I pulled the trigger first. AS GOD AS my witness I did not want to shoot him But, He was going to shoot me First."

¶ 24    Robert Berk testified that he was a trace evidence analyst for the Illinois State Police. In May 2005, he performed an electron microscope analysis of a gunshot residue kit that had been collected from Wilson. In his opinion, the result was negative for gunshot residue on either hand. The delay between the collection of the kit and the analysis would not affect the result of the analysis.

¶ 25    The trial court instructed the jury regarding self-defense theory. After deliberating the jury found defendant guilty of first degree murder, attempt first degree murder, and aggravated battery with a firearm. The court sentenced defendant to consecutive terms of 50 years' imprisonment for first-degree murder and 26 years for attempted first-degree murder.

¶ 26                        B. Postconviction Proceedings

¶ 27    In 2009 defendant filed a *pro se* postconviction petition arguing, *inter alia*, various claims of ineffective assistance of counsel. Relevantly, he argued that counsel was ineffective for failing "to call or interview eyewitness whose testimony would corroborate [his] self-defense claim." Defendant attached to the petition an affidavit of Jeremy Cooper dated January 16, 2009, wherein he averred the following. On the date of the shooting, Cooper was "shooting dice" in a house on

the street where the incident occurred. Cooper went outside and saw two men fighting "on the side of the street." A "dude" got out of a purple car and put a big, silver gun in his pants. Defendant ran up and "tried to stop the dude with the gun by saying, 'don't do it.'" Then the "guy with gun pulled it out first and shot at [defendant]. Then [defendant] pulled out a gun and shot the guy with the big silver gun. [Defendant] then ran down the street with the other person that was fighting." Then another guy picked up the silver gun and shot at defendant as he ran down the street. Cooper ran away after that because a lot of people came out of nowhere and he became scared. At fist Cooper did not say anything because he is not a "snitch," but then he learned how "everyone lied on [defendant and he] had to tell the truth about what happened that day. [Defendant] only shot one guy (the guy who got out of the purple car) – no one else."

¶ 28    In May 2009, the trial court summarily dismissed the petition. We affirmed the court's dismissal. *People v. Abdullah*, 2012 IL App (2d) 090695-U (filed Feb. 2, 2012) (unpublished summary order under Illinois Supreme Court Rule 23(c)).

¶ 29    In December 2021, defendant filed a motion for leave to file a successive postconviction petition seeking relief under the Act. Defendant's motion alleged, *inter alia*, a claim of actual innocence. In particular, defendant's successive postconviction petition asserted that he shot Wilson in self-defense. In support, he included the affidavits of Cooper and Bunch.

¶ 30    Defendant alleged the following:

"Robert Bunch and Jeremy Cooper's averments were discovered on June 2, 2017[,] and [F]ebruary 20, 2018[, r]espectively; over a decade after [defendant's] trial. Their names are not mentioned in the discovery. Nor did [defendant] have any knowledge they witnessed the incident due to the large crowd on the street when the shooting occurred. As such, due diligence could not have uncovered these witnesses sooner."

¶ 31 Jeremy Cooper provided a second notarized and signed affidavit, dated June 2, 2017, wherein he made the same averments as his prior affidavit dated January 2009, including that prior to the shooting, he had been shooting dice at a house on Greenfield. Cooper added that he knew defendant "from seeing him around a few of [his] cousins." Cooper did not "really know too much about [defendant]." Cooper also averred that "nobody ever interviewed [him] about this shooting."

¶ 32 The notarized and signed affidavit of Robert Bunch, dated February 20, 2018, averred that on the day of the incident he was at Tom Alexander's house on the 1800 block of Greenfield where a "big dice game" was going on. As Bunch left the house, he saw Amlet and Melendez fighting on the ground. A "bunch of people" stood around the fight. Then "a purple car stopped in the middle of the street and Marco [Wilson] got out in a[n] aggressive fashion." Wilson tried to help Melendez fight "by walking up on the fight and reaching for something in his waistline." Defendant then "walked over and tried to break up the fight by saying, 'Break it up. Break it up. Get off of him.'" Wilson told defendant that he would "kill" him if he "got involved." Then Wilson "pulled a silver handgun and [defendant said[, ']Don't do it, don't do it[.']" Wilson then said, "'F**k that motherf**ka' and then shot at [defendant] one time. [Defendant] then pulled a gun out that was black and shot [Wilson], then [defendant] ran away down the street. [Melendez] then picked up [Wilson's] gun and started shooting down the street at [defendant]."

¶ 33 On February 16, 2022, the trial court denied defendant's motion for leave to file his successive postconviction petition based on the cause and prejudice test. The trial court reasoned that defendant's initial postconviction petition was fully litigated and there were no additional grounds for relief that would cause it to allow the filing of a successive petition. On March 10, 2022, defendant filed a motion to reconsider which the trial court denied on April 27, 2022. On May 25, 2022, defendant filed a timely notice of appeal.

¶ 34                                   II. ANALYSIS

¶ 35   On appeal, defendant argues that the trial court erred when it denied his motion for leave to file a successive postconviction petition because he presented a colorable claim of actual innocence based on the newly discovered evidence contained in Cooper and Bunch's affidavits. Defendant contends these affidavits exonerate him of his conviction for first degree murder of Wilson because the affidavits establish that Wilson shot first, supporting his claim of self-defense.

¶ 36   The Act provides a statutory remedy to criminal defendants who claim that substantial violations of their constitutional rights occurred at trial. *People v. Taliani*, 2021 IL 125891, ¶ 53. A postconviction proceeding is not a direct appeal from a conviction but constitutes a collateral attack on the judgment. *Id.* The Act contemplates the filing of only one post-conviction petition. *Id.* Succussive petitions impede the finality of criminal litigation, and, therefore, the rules barring them will be relaxed only when fundamental fairness requires. *Id.* ¶ 54.

¶ 37   Illinois recognizes two exceptions where fundamental fairness requires that the bar against successive petitions be lifted: the cause and prejudice exception (see 725 ILCS 5/122-1(f) (West 2020), and the fundamental miscarriage of justice exception. *Id.* ¶ 55. The latter exception requires the defendant to make a persuasive showing of actual innocence. *Id.*

¶ 38   Procedurally, the Act requires leave of court to file a successive petition claiming actual innocence. *Id.* ¶ 58. A request to file a successive petition based on actual innocence is reviewed under a higher standard than that applicable to the first stage for an initial petition, which only requires that the petition is not frivolous or patently without merit. *People v. Robinson*, 2020 IL 123849, ¶ 43. The defendant need not show cause and prejudice. *Taliani*, 2021 IL 125891, ¶ 58. However, the defendant must support his claim of actual innocence with evidence that is (1) newly discovered, (2) material and not cumulative, (3) and of such conclusive character that it would probably change the result on retrial. *Id.*

¶ 39 A trial court should grant a request for leave of court to file a successive petition based on actual innocence where the defendant's supporting documents raise the probability that it is more likely than not that no reasonable juror would have convicted the defendant in light of the new evidence. *Robinson*, 2020 IL 123849, ¶ 44. Conversely, a trial court should deny a request for leave to file a successive petition "only where it is clear from a review of the petition and supporting documentation that, as a matter of law, the petition cannot set forth a colorable claim of actual innocence." *Id.*

¶ 40 Where leave to file a successive petition is granted, the petition is docketed for subsequent second-stage proceedings. *People v. Sanders*, 2016 IL 118123, ¶ 28. We review *de novo* a trial court's denial of leave to file a successive postconviction petition alleging actual innocence. *Taliani*, 2021 IL 125891, ¶ 52. Additionally, we may affirm the court's denial on any basis supported by the record, regardless of the court's reasoning. *People v. Howard*, 2021 IL App (2d) 190695, ¶ 21.

¶ 41 At the pleading stage of postconviction proceedings, all well-pleaded allegations in the petition and supporting affidavits that are not positively rebutted by the trial record are to be taken as true. *Robinson*, 2020 IL 123849, ¶¶ 45. An allegation is positively rebutted by the trial record only if it is "clear from the trial record that no fact finder could ever accept the truth of that evidence, such as where it is affirmatively and incontestably demonstrated to be false or impossible." *Id.* ¶ 60. Also, in deciding the legal sufficiency of a postconviction petition, the court is precluded from making factual and credibility determinations. *Id.* ¶ 42.

¶ 42 Evidence is newly discovered where it was discovered after trial and "could not have been discovered earlier through the exercise of due diligence." *People v. Coleman*, 2013 IL 113307, ¶ 96. An affidavit is newly discovered where no amount of due diligence could have forced the witness to testify to those facts at trial. *People v. Anderson*, 2021 IL App (1st) 200040, ¶ 59; *People*

*v. Fields*, 2020 IL App (1st) 151735, ¶ 48. The defendant bears the burden of demonstrating he exercised due diligence. *People v. Walker*, 2015 IL App (1st) 130530, ¶ 18.

¶ 43    Newly discovered evidence includes testimony from a witness who "essentially made himself unavailable as a witness" by moving out of state (*People v. Ortiz*, 235 Ill. 2d 319, 334 (2009)), testimony from a witness who had been made unavailable through threats or intimidations not to testify (*People v. White*, 2014 IL App (1st) 130007, ¶¶ 20-22), and testimony from a codefendant who could be forced to violate his own fifth amendment right to avoid self-incrimination (*People v. Edwards*, 2012 IL 111711, ¶ 38). At the same time, "[i]f an unknown, unobserved and unrecorded witness chooses not to come forward, there is no amount of due diligence that can force him or her to come forward to 'get involved.'" *Anderson*, 2021 IL App (1st) 200040, ¶¶ 63, 64 (holding that the evidence was newly discovered because it was unlikely that the defendant or others would have observed or noticed the two new witnesses, and they insured their anonymity by their immediately fleeing the scene) (citing *Fields*, 2020 IL App (1st) 151735, ¶¶ 47 48 (evidence was newly discovered because witness moved out of town before trial)).

¶ 44    Defendant argues that Cooper and Bunch's affidavits are newly discovered because they were not referred to at trial or in discovery, there was a large crowd at the shooting, and defendant was unaware that they witnessed the shooting. Defendant thus asserts that due diligence could not have uncovered Cooper and Bunch's observations of the incident prior to trial.

¶ 45    Here, *Walker* and *Wingate* are instructive. In *Walker*, the defendant claimed actual innocence based on a statement from a witness, provided 27 years after the crime, that the witness observed the crime, and the defendant was not the perpetrator. *Walker*, 2015 IL App (1st) 130530, ¶¶ 6, 18. The witness did not allege that he failed to come forward out of fear for repercussion or explain his 27-year absence or his whereabouts between the crime and the statement, and the

defendant did not explain why the witness had not been previously located. *Id.* ¶ 18. The majority found that the witness's statement was not newly discovered evidence. *Id.* The dissent argued that the defendant should not have been expected to find witnesses supporting his actual innocence claim while he was incarcerated and had no way of knowing the witness observed the crime. *Id.* ¶ 34 (Pucinski, J., dissenting). The majority countered that it was the defendant's burden to show due diligence, and the statement was not new evidence because he failed to explain why the witness was not previously located. *Id.* ¶ 18.

¶ 46     In *Wingate*, an affiant who was at the scene of a shooting came forward several years later and averred that one of the people at whom the defendant shot raised a firearm towards the defendant before the defendant fired. *Wingate*, 2015 IL App (5th) 130189, ¶ 20. However, the affidavit contained no facts suggesting that the affiant was positioned such that he could not have been observed by other people at the scene of the shooting, or facts suggesting the affiant was unavailable or could not be located after the crime. *Id.* ¶¶ 27-28. Nor did the postconviction petition allege any facts regarding whether other witnesses who were interviewed by police failed to tell the police the affiant was at the scene. *Id.* ¶ 29. Thus, the appellate court found that the defendant did not allege "*any* facts that would, if taken as true, validate the proposition that the defendant exercised due diligence" in attempting to discover the affiant. (Emphasis in original.) *Id.* ¶ 30.

¶ 47     The same reasoning applies here. Cooper and Bunch's affidavits, which we must accept as true (*Robinson*, 2020 IL 123849, ¶ 45), establish that, prior to the shooting, they were at Tom Alexander's house where a dice game was going on. When they left Alexander's house, they saw Amlet and Melendez fighting on the ground with a "bunch of people standing around the fight." Cooper saw a man get out of a car and put a big silver gun in his pants. Bunch saw Wilson get out of a car and walk up to the fight. Bunch also saw defendant walk over and try to break up the fight and heard defendant say, "break it up, break it up, get off of him." Similarly, Cooper saw defendant

try to stop the man with the silver gun. Bunch heard Wilson tell defendant that if he got involved, Wilson would kill defendant, and saw Wilson pull a silver gun. Cooper and Bunch then heard defendant say, "Don't do it." Bunch heard Wilson say, "F**k that Motherf**ka." Cooper and Bunch saw Wilson shoot at defendant. Cooper and Bunch saw defendant shoot Wilson and run down the street. Bunch described defendant's gun as black. Cooper and Bunch also saw Melendez pick up Wilson's gun and shoot down the street at defendant.

¶ 48 Cooper and Bunch was close enough to defendant, Wilson, and Melendez to hear and see what they did and said, and to observe their firearms. Therefore, Cooper and Bunch would have been visible to Melendez and Presley who were also at Alexander's house shooting dice prior to the shooting and others in the crowd. In other words, Cooper and Bunch were not unknown, and Bunch did not aver that he fled the scene. Compare *People v. Anderson*, 2021 IL App (1st) 200040, ¶ 64 (holding that the evidence was newly discovered because it was unlikely that the defendant or others would have observed or noticed the two new witnesses, and they insured their anonymity by their immediately fleeing the scene).

¶ 49 Further, defendant fails to explain his efforts to identify anyone at the scene that could corroborate his self-defense theory. As in *Wingate*, he alleges no facts from which we could infer that he exercised due diligence in attempting to identify and locate Bunch. See *Wingate*, 2015 IL App (5th) 130189, ¶ 30. Moreover, Bunch does not aver in his affidavit that he was in any way unavailable or could not have been located. Bunch does not explain his nearly 14-year absence or why he decided to come forward so many years later. Further, Cooper's averment that he fled the scene was the only pertinent addition to his previously filed 2009 affidavit. While Cooper's affidavit may excuse his own failure to come forward sooner, it does not establish that defendant exercised due diligence in discovering him as a witness. Further, neither Bunch nor Cooper aver that they moved away or otherwise became unavailable as a witness. *Cf. Ortiz*, 235 Ill. 2d 319, 334

(2009) (witness "essentially made himself unavailable" by moving out-of-state shortly after witnessing crime). There were a finite number of people an investigator would have had to interview about potentially corroborating defendant's version of the events, but defendant did not offer a single explanation as to why an investigator would not have been able to locate the affiants sooner with due diligence. Thus, Cooper and Bunch's affidavits cannot be considered new evidence. *Coleman*, 2013 IL 113307, ¶ 96 (to be new, evidence must not have been discoverable earlier through due diligence); see also *Walker*, 2015 IL App (1st) 130530, ¶¶ 16, 18 (rejecting a claim of newly discovered evidence based upon an eyewitness who claimed to have seen the shooting and that the shooter was not the defendant; the witness's statement failed to "provide the court a reasonable explanation for either [the witness's] 27-year absence or his sudden appearance," and the defendant "fail[ed] to explain why [the witness] was not located until nearly 30 years after the crime occurred"); *Wingate*, 2015 IL App (5th) 130189, ¶ 27 (affidavit explaining why the witness did not come forward did not address whether the defendant exercised due diligence).

¶ 50    After oral argument defendant moved to cite additional authority. We grant defendant's motion. However, *People v. Ayala*, 2022 IL App (1st) 193484, cited by defendant, is distinguishable from this case. In *Ayala*, the court held that the affidavits of four alleged gang participants qualified as newly discovered evidence because the participants were unavailable to testify at trial. *Id.* ¶¶ 136-137 (one witness asserted his fifth amendment right against self-incrimination, and the other three failed to testify due to fear of police and prosecutorial threats, intimidation, and physical abuse). The court also held that the affidavits of two witnesses who recanted their testimony qualified as newly discovered evidence. *Id.* ¶¶ 138-140. Here, defendant has not demonstrated that Cooper and Bunch were unavailable to testify, or that they now aver that they lied at trial and want to recant their testimony. Therefore, *Ayala* does not apply to this case.

¶ 51     We note that the State urges us to take judicial notice that Bunch was in the custody of the Lake County jail on the night of the shooting. The State contends that because "these suspicious circumstances cast doubt on whether [Bunch's affidavit is] truly newly discovered evidence, or more newly created evidence," a finding that Bunch's affidavit "is newly discovered is simply not possible." We are precluded, however, from making factual and credibility determinations. *Robinson*, 2020 IL 123849, ¶ 42. Credibility findings and determinations as to the reliability of the supporting evidence are to be made only at a third-stage evidentiary hearing in a successive postconviction proceeding. *Sanders*, 2016 IL 118123, ¶ 42. Therefore, we decline to consider the State's argument.

¶ 52     In sum, where Cooper and Bunch's affidavits cannot be considered new evidence, defendant failed, as a matter of law, to make a colorable claim of actual innocence, and the court did not err in denying him leave to file a successive petition. See *Sanders*, 2016 IL 118123, ¶ 24.

¶ 53                                  III. CONCLUSION

¶ 54     The judgment of the circuit court of Lake County is affirmed.

¶ 55     Affirmed.